| | |
|---|---|
| **DISTRICT COURT, DENVER COUNTY**<br>**STATE OF COLORADO**<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED: July 3, 2021 4:55 PM<br>FILING ID: E46FCA2BAB5CB<br>CASE NUMBER: 2021CV32115 |
| WOODSIDE VILLAGE II CONDOMINIUM ASSOCIATION, INC., and<br>CLAIM & CONSTRUCTION MANAGEMENT GROUP, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>AMGUARD INSURANCE COMPANY and WESTGUARD INSURANCE COMPANY<br><br>Defendants. | ▲ **FOR COURT USE ONLY** ▲ |
| **ATTORNEY FOR PLAINTIFFS:**<br>Larry E. Bache, Jr., #51958<br>Jonathan E. Bukowski, #45614<br>MERLIN LAW GROUP, P.A.<br>1001 17th Street, Suite 1150<br>Denver, CO 80202<br>Phone: 720-665-9680<br>Fax: 720-665-9681<br>E-Mail: lbache@merlinlawgroup.com<br>E-Mail: jbukowski@merlinlawgroup.com | Case Number:<br><br><br>Div.:          Ctrm: |
| **COMPLAINT AND JURY DEMAND** | |

COMES NOW Plaintiffs, Woodside Village II Condominium Association, Inc. and Claim & Construction Management Group, LLC, by and through their undersigned counsel, and hereby submit this their Complaint against Defendants, WestGUARD Insurance Company and AmGUARD Insurance Company, and in support of their Complaint, allege and aver as follows:

## PARTIES

1. Plaintiff, Woodside Village II Condominium Association, Inc. ("Plaintiff" or "Woodside Village") is a Colorado nonprofit corporation with its principal office in Lakewood, Colorado.

2. Plaintiff, Claim & Construction Management Group, LLC, is a Colorado limited liability company with its principal office in Denver, Colorado.

3. Defendant, AmGUARD Insurance Company ("Defendant" or "AmGUARD"), is an insurance company domiciled in the State of Pennsylvania authorized engage in the business of Insurance in the State of Colorado.

4. Defendant, WestGUARD Insurance Company ("WestGUARD"), is an insurance company domiciled in the State of Pennsylvania authorized to engage in the business of insurance in the State of Colorado.

5. AmGUARD is a wholly-owned subsidiary of WestGUARD which is a wholly-owned subsidiary of National Indemnity Company, a Nebraska corporation, which is a wholly-owned subsidiary of Berkshire Hathaway, Inc., a Delaware corporation.

6. Berkshire Hathaway Inc. has no parent company and is a holding company organized under the laws of Delaware that directly owns all of the issued and outstanding common stock of National Indemnity Company, which directly owns all of the issued and outstanding common stock of AmGUARD, and the sole ultimate controlling person of the holding company system that includes AmGUARD and WestGUARD is Warren Buffett.

7. Berkshire Hathaway Guard Insurance Companies is a trade name.

8. Defendants AmGUARD and WestGUARD (collectively "Defendants") do business under the trade name Berkshire Hathaway Guard Insurance Companies ("Berkshire Hathaway").

## JURISDICTION AND VENUE

9. This Court has subject matter and personal jurisdiction over the parties to this cause of action.

10. A cause of action exists under Colorado state law for claims regarding the conduct complained of herein.

11. Jurisdiction is proper as to AmGUARD pursuant to Colorado Revised Statutes § 13-1-124(1)(a), (b), and (d) because AmGUARD conducted the business at issue in this action, committed tortious misconduct and contracted to insure property within Denver County, Colorado.

12. Venue is proper pursuant to Col.R.Civ.P. 98 because the events which constitute the basis of this Complaint and Jury Demand, including, but not limited to, the formation of the insurance policy and location of the property in question, occurred in Denver County, Colorado.

## FACTS COMMON TO ALL COUNTS

### A. THE PROPERTY

13. Woodside Village maintains certain residential real property located at 8225 Fairmount Drive, Denver, Denver County, Colorado 80247-1128 (the "Property").

14. The Property includes sixteen multi-story, residential buildings, as well as a pool house and several freestanding garages.

15. The exterior walls of the structures are constructed with wood framing covered with siding.

16. The roofs covering the buildings of the Property constructed in a gable configuration and covered with an architectural asphalt shingle roofing system.

17. The architectural asphalt shingles covering the roofs are manufactured with a granule layer, top asphalt layer, fiberglass reinforcement layer, and a base asphalt layer. These layers work together as a system designed to provide an appealing visual aesthetic as well as protection from weather elements to the interior of the property. If any layer of the shingle is

compromised or damaged, the shingle system can no longer function as designed. If the shingle system no longer functions as designed. it will no longer provide a barrier to the elements.

**B.     APPLICABLE PROVISIONS OF THE INSURANCE POLICY**

18.     Woodside Village obtained an all-risk, replacement cost value, policy of insurance from AmGUARD under Policy Number WOBP997472 (the "Policy").

19.     The Policy has effective dates of August 1, 2018 through August 1, 2019.

20.     In return for Woodside Village's payment of premium totaling $38,291, and subject to all terms of this policy, AmGUARD agreed to provide coverage for direct physical loss or damage to covered property at the Property caused by or resulting from any covered cause of loss, including hail.

21.     The Policy provides the following building coverage:

| Location | Building | Coverage | Building Coverage |
|---|---|---|---|
| 001 | 001 | Replacement Cost Value | $855,960 |
| 001 | 002 | Replacement Cost Value | $1,177,680 |
| 001 | 003 | Replacement Cost Value | $1,177,680 |
| 001 | 004 | Replacement Cost Value | $1,711,920 |
| 001 | 005 | Replacement Cost Value | $1,711,920 |
| 001 | 006 | Replacement Cost Value | $1,711,920 |
| 001 | 007 | Replacement Cost Value | $855,960 |
| 001 | 008 | Replacement Cost Value | $1,711,920 |
| 001 | 009 | Replacement Cost Value | $1,711,920 |
| 001 | 010 | Replacement Cost Value | $1,177,680 |
| 001 | 011 | Replacement Cost Value | $120,000 |
| 001 | 012 | Replacement Cost Value | $60,000 |
| 001 | 013 | Replacement Cost Value | $60,000 |
| 001 | 014 | Replacement Cost Value | $75,000 |
| 001 | 015 | Replacement Cost Value | $60,000 |
| 001 | 016 | Replacement Cost Value | $150,000 |

22.     The Policy does not include a definition of direct physical loss.

23.     The Policy does not include a definition of direct physical damage.

24. On July 5, 2019, during the Policy period, a hail and wind storm occurred at the Property (the "Storm").

25. The Property suffered direct physical loss and/or damage resulting from a hail and/or wind storm (the "Storm").

26. At the time of the Storm, direct physical loss of or damage caused by hail and wind were covered causes of loss under the terms and conditions of the Policy.

27. Pursuant to the Policy, Defendants agreed to repair, rebuild, or replace damaged property with materials of like kind and quality.

28. The Policy does not include a matching limiting endorsement or exclusion.

29. The Policy does not limit or exclude coverage for direct physical loss or damage caused by hail to a roof covering resulting in a reduction of the useful life of the roof covering.

30. The Policy does not limit or exclude coverage for direct physical loss or damage caused by hail to a roof covering resulting in a loss of performance of the roof covering.

31. The Policy does not include a limitation or exclusion of coverage for direct physical loss or damage caused by hail to a roof covering resulting in a loss in the market value of the roof covering.

32. The Policy does not require that the Property sustain functional damage for coverage to be afforded to for direct physical loss or damage to covered property at the premises caused by or resulting from any covered cause of loss.

33. The Policy does not include a cosmetic damage exclusion or a cosmetic damage limiting endorsement.

34. The Policy further provides that legal action against must be brought within two years of the date of loss:

*4. Legal Action Against Us*

*No one may bring a legal action against us under this insurance; unless*

*a. There has been full compliance with all of the terms of this insurance; and*

*b. The action is brought within 2 years after the date on which the direct physical loss or damaged occurred.*

35. Defendants, by and through their agents and representatives, had knowledge (or constructive knowledge) of the construction of the insured Property, the age and condition of the insured Property, and the use of such Property, and at all material times hereto Defendants decided to insure and continue to insure the Woodside Village Property. Defendants having such knowledge accepted premium payments from Woodside Village in exchange for insuring the Woodside Village Property against loss resulting from wind or hail and other perils.

36. Defendants must pay for the cost to achieve a reasonable uniform appearance between the repair, rebuild or replacement of the damaged property and the materials existing on the Property. *See Hamlet Condominium Ass. v. American Mutual Family Ins. Co.*, 2016 CV 30594 (Co. Dist. Ct., April 12, 2017).

## C.     THE SUBJECT HAIL AND WINDSTORM

37. On July 5, 2019, the Storm caused direct physical loss and/or damage to the Property, including to the skylights, decks, downspouts, paint, chimney flashing, shingled roofing systems covering the Property, as well as other building components of the Property (the "Loss").

38. The Storm caused direct physical loss and/or damage to the shingles covering the Property resulting in an acute displacement of granules exposing the fiberglass reinforcement mat to the elements.

39. Hail stone impact damage to the shingles caused by the Storm have resulted in the failure of the shingle roof coverings to perform their intended function of keeping out the elements for the remainder of their original, useful life.

40. The direct physical loss and/or damage resulting from the Storm has diminished the long-term service life of the roofing system covering the Property.

41. The Loss was timely reported to Defendants (the "Claim").

42. Defendants assigned Claim Number WOBP997472-001-001-001 to the Claim.

**D. DEFENDANTS CONTINUE TO CONCEAL THE FINDINGS OF THEIR INITIAL INSPECTION AND EVALUATION OF THE LOSS**

43. At all times relevant to this Complaint, employees of WestGUARD provided claims investigation and handling for the insurance claims at issue in this litigation, which were noticed and filed with AmGUARD pursuant to the terms and conditions of the Policy.

44. At all times relevant to this Complaint, various service and operating agreements, including intercompany and related-party agreements, were in place relating to administrative services, intercompany services, cost sharing, and/or tax allocation among Defendants. More specifically, upon information and belief multiple "Administrative Service Agreements," an "Intercompany Services and Cost Sharing Agreement" and/or multiple "Service Agreements" were in place that identify the services to be provided, expenses to be shared with payment terms, compensation to be provided, allocation of expenses and payment terms, and tax liabilities to be paid and payment terms by and between Defendants, by WestGUARD to AmGUARD and other related companies, and to WestGUARD or AmGUARD from other related companies.

45. Upon information and belief, Defendants assign claims to their adjusters without regard for their qualifications, skills, and training, or its supervision and oversight of the adjusters' abnormally high volume of assigned claims.

46. Defendants' reckless indifference to the assigned adjusters' qualifications, skills, and training, or its supervision and oversight of the adjusters' abnormally high volume of assigned claims is part of an institutional pattern and practice of improper claims handling practices.

47. Defendants assigned its claims adjuster, William Ardoline, to investigate and adjust the Claim. Mr. Ardoline is a Commercial Property Insurance Adjuster II.

48. Defendants also retained Engle Martin & Associates ("Engle Martin") to assist with the investigation of the Claim. Engle Martin in turn assigned a Senior Property Adjuster, Jaren Genest, to the Claim.

49. On September 10, 2019, Mr. Genest issued correspondence to Woodside Village to advise of the status of the Claim. Mr. Genest notified Woodside Village that Engle Martin had completed an inspection of the Property and forwarded its report along with its inspection findings to Defendants ("Inspection Report").

50. On September 10, 2019, Defendants knew or should have known that covered benefits under the Policy were owed under the Policy.

51. On November 1, 2019, Woodside Village requested a copy of the Inspection Report that Engle Martin send to Defendants. In response to its Insured's request for relevant information related to the Claim, Engle Martin notified Woodside Village that because its *reports are work product, we are unable to forward them.*

52. To date, Woodside Village has not been provided with a copy of the Engle Martin Inspection Report. Instead, Defendants continue to conceal the Engle Martin Inspection Report from Plaintiffs.

53. Plaintiffs' experience is not an isolated case. The concealment of relevant information from policyholders occurs with such frequency that it constitutes a general business

practice of Defendants with regard to the handling first party property insurance claims. Defendants' entire claims process is unfairly designed to reach favorable outcomes for the company at the expense of the policyholders.

### E.  WOODSIDE VILLAGE FORCED TO ADJUST ITS OWN CLAIM

54. Woodside Village engaged Claim & Construction Management Group, LLC. ("CCMG"), to assist it in the investigation and adjustment of Woodside's claim for direct physical loss and damage to the Property resulting from a hail and windstorm on July 5, 2019.

55. Woodside Village executed an Assignment and Agreement for Services ("Agreement") with CCMG which authorized CCMG to represent Woodside Village in the initiation, management, completion, and settlement of the Claim. Of note, the Agreement assigned CCMG the right to collect insurance proceeds directly from Defendants and submit invoices, pursue payment and take legal action related to the Claim.

56. Accordingly, both Woodside Village and CCMG, (collectively, "Plaintiffs") have an interest in the Claim.

57. On April 22, 2020, CCMG provided Defendants with a letter of representation and copy of the Agreement. CCMG further requested that Defendants release a copy of its estimate for repair, certified copy of the Policy, and any reports related to the Claim. CCMG continually renewed its request for relevant information throughout the Claim to no avail.

58. CCMG presented Defendants with an estimate of repairs for exterior damages to its roofs, skylights, flashing metals, decks, paint, and other building materials at the Property ("CCMG's Estimate"). To date, Defendants have not issued payment for, or in any way responded to, the scope of repairs provided by CCMG.

59. Upon receipt of the CCMG Estimate, Defendants knew or should have known that covered benefits under the Policy were owed under the Policy.

### F. DEFENDANTS CONTINUE TO WITHHOLD COVERED BENEFITS DESPITE RECEIVING ADDITIONAL CONFIRMATION OF DAMAGE CAUSED BY THE STORM

60. On or around November 2020, Defendants retained Haag Construction Consultants to assist with determining the scope of hail damage to the Property.

61. Haag Construction Consultants works with insurance carriers, such as Defendants, to *Assess the damage, Develop the scope, Document the loss, Determine the necessary experts, Defendant and control the cost,* and *Provide a defensible report.*[1]

62. Haag Construction Consultants assigned the Claim to a Senior Construction Consultant, Jason Plasters.

63. On or around November 11, 2020, Mr. Plasters performed an inspection of the Property and identified hail damage caused by the Storm to the mailboxes, 8 dumpsters, 11 buildings, 6 garages, and 1 shed.

64. On January 28, 2021, Mr. Plasters prepared a scope and estimate of repairs totaling $106,234.61.

65. On January 28, 2021, Defendants knew or should have known that covered benefits under the Policy were owed under the Policy.

### G. PLAINTIFFS PROVIDE DEFENDANTS WITH ADDITIONAL INFORMATION DEMONSTRATING DAMAGE CAUSED BY THE STORM

66. Plaintiffs retained a Colorado professional licensed engineer to provide an evaluation of the hail stone impact damage to the Property. Plaintiffs' professional engineer

---

[1] https://haagglobal.com/am-site/media/construction-consulting-info.pdf

documented hail impacts to the roof coverings, gutters, downspouts, wood siding, wood handrailing, wood trim, gable end vents, and wood garage doors.

67. Plaintiffs professional engineer confirmed the damages previously identified and presented by Haag Construction Consultants and CCMG.

68. On or about June 16, 2021, Plaintiffs provided Defendants with its professional engineering report and requested clarification weather there was any additional information n that would assist with moving the Claim forward.

69. To date, Defendants have made no effort to contact the professional licensed engineer hired by Plaintiffs to discuss his investigation or analysis.

70. On or about June 16, 2021, AmGUARD had sufficient information within its possession to tender covered benefits for the Loss.

H. **DEFENDANTS CONTINUE TO CONCEAL RELEVANT INFORMATION AND WITHHOLD COVERED BENEFITS DUE UNDER THE INSURANCE POLICY**

71. On May 10, 2021, Plaintiffs reaffirmed their requests for a copy of the insurance Policy, Engle Martin Inspection Report, and all estimates for repair within Defendants' possession.

72. On May 26, 2021, Defendants released a copy of the scope and estimate of repairs prepared by Haag Construction Consultants.

73. On June 29, 2021, Defendants released a copy of the insurance Policy.

74. Despite continued requests[2], Defendants <u>have not released any payment</u> for damages to the Property caused by the July 2019 Storm.

I. **DEFENDANTS COMPELL PLAINTIFFS TO INSTITUTE LITIGATION TO RECOVER AMOUNTS DUE UNDER THE INSURANCE POLICY**

---

[2] May 17, May 26, June 4, June 16, June 22, June 24, June 28, July 2, 2021.

75. On June 22, 2021, Plaintiffs requested that AmGUARD enter into a tolling agreement to allow for the completion of the adjustment of the Claim. Plaintiffs continued to reaffirm its request[3] for a tolling agreement to avoid the filing of this litigation.

76. AmGUARD has failed to respond or acknowledge to any Plaintiffs' requests for a tolling agreement.

77. Plaintiffs have fulfilled all duties required under the Policy after discovery of the Loss.

78. Plaintiffs have performed all conditions precedent and subsequent required under the insurance Policy, or alternatively, have been excused from performance by the acts, representations, and/or conduct of Defendants.

79. The actions of Defendants have caused great financial harm to Plaintiffs. The cost of repair to the Property have increased due to the unreasonable delay caused by Defendants' concealment of relevant information and withholding of covered benefits owed under the insurance Policy. Plaintiffs have also incurred significant costs in their retention of a professional engineer to reconfirm the unpaid damage to the Property.

80. It is apparent from Defendants conduct that they have adopted a plan or approach to delay, as much as possible, its handling and payment of the Claim.

81. As a result of Defendants' wrongful acts and omissions, Plaintiffs were forced to retain the professional services of Merlin Law Group, PA, who is representing Plaintiffs with respect to these causes of action.

---

[3] June 24, June 29, July 1, and July 2, 2021.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

82. Plaintiffs realleges and reaffirms Paragraphs 1-81 as if fully set forth herein.

83. Woodside Village purchased an all-risk policy requiring AmGUARD to pay for any and all fortuitous damages resulting from a loss not expressly excluded or otherwise limited by the Policy.

84. The Policy between Woodside Village and AmGUARD is a binding contract.

85. The Agreement between Woodside Village and CCMG is a binding contract for the Claim.

86. Woodside Village paid premiums and otherwise performed all conditions precedent to recovery of benefits under its Policy with Defendants.

87. Defendants have denied certain covered damages and continues to delay and deny certain claimed damages.

88. Defendants' failure to honor their obligations under the Policy is a breach of contract.

89. Defendants' breach of contract has damaged, and continues to damage, Plaintiffs.

90. Plaintiffs are entitled to all benefits due and owing under the Policy.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment against, Defendants for damages resulting from breach of contract, costs, pre-judgment interest, attorneys' fees pursuant to applicable law, and such other relief as the Court deems appropriate.

## SECOND CLAIM FOR RELIEF
### (Unreasonable Delay and Denial of Payment of Covered Benefits Pursuant to C.R.S. §§ 10-3-1115 and 10-3-1116)

91. Plaintiffs realleges and reaffirms Paragraphs 1-90 as if fully set forth herein.

92. Under Colorado Revised Statute § 10-3-1115, an insurer who delays or denies payment to an insured without a reasonable basis for its delay or denial is in breach of the duty of good faith and fair dealing.

93. Under Colorado Revised Statute § 10-3-1115, an insurer's delay or denial is unreasonable if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action.

94. Woodside Village and CCMG are first-party claimants within the meaning of Colorado Revised Statute § 10-3-1115(1)(b)(1).

95. Defendants had the non-delegable duty to investigate the claim objectively and to advise of coverage under the Policy.

96. Defendants delayed and denied payment of covered benefits to Plaintiffs as alleged in the preceding paragraphs of the Complaint without a reasonable basis for its actions.

97. Defendants have unreasonably delayed payment to Plaintiffs. Measured against objective industry standards for claim handling and payment, Defendants' actions have unreasonably delayed payment of the loss and damage. As more fully alleged above, Defendants have concealed relevant information from Plaintiffs and refused to release undisputed benefits to Plaintiffs despite have knowledge that covered benefits are owed under the Policy. Defendants have failed to acknowledge and act reasonably promptly upon communications with respect to the Claim. The conduct of Defendants in handling the Claim has led to an undeniable delay of in the payment covered benefits to Plaintiffs without a reasonable basis.

98. Defendants have further delayed the Claim by failing to objectively evaluate the Claim based on all available evidence, and not just evidence which Defendants believed supported their position. More specifically, Defendants have refused to provide coverage for the roof

covering and other damaged components at the Property despite recommendations from CCMG, Plaintiffs professional engineer, Engle Martin, and Haag Construction Consultants.

99. It is apparent from Defendants' conduct in the handling of the Claim that Defendants have adopted a plan or approach to delay, as much as possible, its handling and payment of the Claim.

100. Defendants further delayed and denied payment of covered benefits without a reasonable basis for its action by failing to issue an actual cash value payment of undisputed covered benefits after learning that coverage was owed.

101. As a result of Defendants' material breaches of the Policy, Woodside Village has been unable to move forward with repairs to its Property.

102. Based upon the foregoing Paragraphs, Plaintiffs are therefore entitled to two times the covered benefit that have been delayed and denied to it, attorneys' fees, and costs pursuant to C.R.S. § 10-3-1116, together with pre-judgment interest at the highest rate allowed by law.

**WHEREFORE**, Plaintiffs respectfully request this Court enter judgment against, Defendants, WestGUARD Insurance Company and AmGUARD Insurance Company, for damages authorized pursuant to Colorado Revised Statute § 10-3-1116, costs, pre-judgment interest, attorneys' fees pursuant to applicable law, and other such relief as the Court deems appropriate.

### THIRD CLAIM FOR RELIEF
(Bad Faith Breach of Insurance Contract)

103. Plaintiffs reallege and reaffirm Paragraphs 1-102 as if fully set forth herein.

104. Defendants owed duties arising from the Policy's implied covenants of good faith and fair dealing, under which Defendants covenanted that they would, in good faith and in the exercise of fair dealing, deal with Woodside Village fairly and honestly, faithfully perform their

duty of representation, and do nothing to impair, interfere with, hinder, or potentially injure Woodside Village's rights to receive the benefits provided by the Policy.

105. An insurer breaches its duty of good faith and fair dealing when it engages in unfair claim settlement practices, denying and delaying due payment of available benefits under the Policy.

106. At all times, Woodside Village fulfilled its obligations under the Policy and acted in accordance with its duty of good faith and fair dealing.

107. Defendants have breached its covenant of good faith and fair dealing that it is owed to Woodside Village by engaging in a pattern of conduct designed to deprive Woodside Village of its rights and benefits under the Policy. As described in more detail above, Defendants and their agents knowingly underestimated the Claim and misrepresented the scope of damage to the Property.

108. As alleged above and among other circumstances, Defendants committed numerous, willful or reckless unfair claim settlement practices including, without limitation:

(a) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under the insurance Policy it wrote and issued;

(b) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(c) Refusing to pay claims without conducting a reasonable investigation based upon all available information, ignoring material information supplied by its insured and accepting obviously biased, result-oriented opinions from its retained expert to "justify" deficient assessments of its liability under the Policy;

(d) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear, such that the damages from the hail event exceeded the amount acknowledged as being owed under the Policy;

(e) Failing to reasonably adjust and compelling Woodside Village to utilize litigation to recover amounts due under the insurance Policy by withholding covered benefits due under the Policy;

(f) Encouraging its claim representatives, including William Ardoline, to engage in unfair claims settlement practices against Woodside Village, thereby violating applicable standards in the industry and the laws and regulations of the State of Colorado.

109. Defendants has committed such actions willfully and with such frequency as to indicate a general business practice.

110. Defendants' unreasonable conduct, including its concealment of relevant information, refusal to release undisputed payments, complete rejection of additional evidence from Woodside Village professional engineer, and refusal to enter into a tolling agreement has effectively compelled Woodside Village to institute litigation to recover amounts due under the insurance Policy.

111. Woodside Village has suffered and continues to suffer actual damages due to Defendants' breach of its covenant of good faith and fair dealing. As a direct and proximate result of Defendants' actions, Woodside Village has:

(a) Incurred and will incur in the future increased costs to repair, restore and/or replace the significant property damage;

(b) Suffered and will continue to suffer damages as a foreseeable and proximate result of the misconduct alleged; and

(c) Suffered and will continue to suffer other expenses, including engineering fees, attorneys' fees, investigatory fees, and other losses.

WHEREFORE, Plaintiff, Woodside Village II Condominium Association, Inc., respectfully request this Court enter judgment against, Defendants, WestGUARD Insurance Company and AmGUARD Insurance Company, for all damages suffered as a foreseeable and proximate result of the conduct alleged herein, pre and post judgment interest, attorneys' fees in

accordance with applicable law, costs including expert witness fees, and such other and further relief as the Court deems just and proper.

## REQUEST FOR JURY TRIAL

112.    Plaintiffs request trial by jury with respect to all claims and issues triable to a jury.

Dated: July 3, 2021                                                        Respectfully submitted,


                                                                      s/ *Jonathan E. Bukowski*
                                                                      Larry E. Bache, Jr., Esq.
                                                                      Jonathan E. Bukowski, Esq.
                                                                      Merlin Law Group, PA
                                                                      1001 17th Street, Ste. 1150
                                                                      Denver, CO 80202
                                                                      Telephone: 720-665-9680
                                                                      Facsimile: 720-665-9681
                                                                      E-Mail: lbache@merlinlawgroup.com
                                                                      E-Mail: jbukowski@merlinlawgroup.com